UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| WALDO J. MORET, JR. CLYDE M. HUNTER, AND SHIKEEMA L. JONES | * * * | **CIVIL ACTION NO: NO. 26-1636** |
| | | JUDGE CARL J. BARBIER |
| VERSUS | * * | MAG. JUDGE MICHAEL NORTH |
| BRUNO & TERVALON, LLP, JONALD WALKER, III, and STERLING-WALKER ENTERPRISES, LLC | * * * * | |

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**MAY IT PLEASE THE COURT:**

Defendants, Jonald Walker, III ("**Mr. Walker**"), Bruno & Tervalon, LLP ("**B&T**"), and Sterling-Walker Enterprises, LLC ("**Sterling-Walker**") file this Opposition to the Motion for Temporary Restraining Order and Preliminary Injunction (the "**Motion**") [doc. 7] filed by Plaintiffs, Clyde M. Hunter, Shikeema L. Jones, and Waldo J. Moret, Jr. and request that after consideration of the following information, this Honorable Court deny Plaintiffs' request for the harsh, drastic, and extraordinary remedy of injunctive relief. Under the given circumstances, an injunction and civil sequestration are not proper remedies.

## I. FACTUAL BACKGROUND

This matter arises out of the alleged theft, conversion, and unlawful dissipation of funds by Mr. Walker and B&T from the Bruno & Tervalon CPAs 401(k) Profit Sharing Plan and Trust employee pension benefit plan (the "**Plan**") previously administered by John Hancock Life Insurance Company ("**John Hancock**"). While the allegations are salacious, the actual facts are far less sensational.



5687469.v1

**A. B&T Forms as an Accounting Firm through a Partnership.**

The Plaintiffs are two former employees and one former partner of Bruno & Tervalon LLP ("**B&T**" or the "**Firm**"), a certified public accounting firm previously located in New Orleans, Louisiana.[1] It was formed via a partnership agreement between Mr. Michael Bruno and Mr. Alcide Tervalon in 1983, an agreement which still binds the partnership, a copy of which is attached as Exhibit "A". Importantly, the Partnership Agreement states, among other things:

- 4-1 – "The capital of the partnership shall be maintained at a sufficient level as to adequately provide necessary working capital and facilities for the operation of the business, as determined by the managing partner. An individual capital account shall be maintained for each partner, and, except by unanimous agreement of the partners or upon dissolution, the capital contributions of the partners shall not be subject to withdrawal."
- 5-3 – "An individual drawing account shall be maintained for each partner, his proportionate share of profits and losses and drawing accounts shall be credited or debited to the individual partners capital accounts as soon as possible after the close of each fiscal year."
- 7-5 withdrawal – " . . . The interest of a withdrawing partner shall be determined on an accrual basis subject, however, to adjustment for the valuation of any stocks, bonds, or other investment securities, or real estate which may be owned by the partnership at that time and which shall be valued at market price as of the end of the month during which the withdrawal occurs. . . "

In 1992, Mr. Bruno and Mr. Tervalon offered partnership in the Firm to Plaintiff Waldo J. Moret, Jr. ("**Mr. Moret**"). In 2002 and 2007, partnership was offered to Paul Andoh and Joseph Akanji, respectively.

In 2013, John Hancock issued a Recordkeeping Agreement to B&T. The Recordkeeping Agreement was "presented by" Bernard Robertson ("**Mr. Roberston**"), a copy of which is attached as Exhibit "B". Mr. Robertson was listed as the "financial representative" of B&T, and Retirement Strategies Group was listed as the Third Party Administrator. The financial

[1] Rec. Doc. 1, Complaint, p. 3, at ¶¶ 5-7.

representative is the individual whom John Hancock would "make available plan-level and participant-account-level information." One aspect of the plan is that when a partially vested participant receives a distribution of the vested portion of his/her account, the non-vested portion is forfeited. It is this aspect that led Mr. Walker to believe that Ms. Jones and Mr. Hunter's funds had been forfeited, which he believed explained the discontinuance balance deposited in B&T's account.

### B. Mr. Walker Mergers His Firm, J. Walker & Company, with B&T And Acquires an Interest; the Partners' Deceptions Become Clear.

In 2022, B&T merged with J. Walker & Company and Mr. Walker purchased Al Tervalon's interest in the merged firm. At that time, the partners in the firm were Mr. Walker, Mr. Tervalon, Mr. Andoh, and Mr. Akanji. In February 2025, Mr. Moret retired from B&T.

As Mr. Walker assumed the management of B&T in 2022, he began to see that the prior partners had been dishonest about B&T's financial condition and engaged in transactions that were improper and violated their partnership agreement in place. For example, between the time that Mr. Walker agreed to purchase Mr. Tervlon's interest in B&T and agreed to the merger and the time that Mr. Walker assumed Mr. Tervalon's interest, it was apparent the partners had taken nearly $400,000 of operating capital for the Firm and improperly moved it into their retirement accounts. The prior partners also closed B&T's line of credit, meaning there was no substantial source of working capital to use for daily or monthly operating expenses.

In May 2022, Mr. Walker had to infuse $150,000 of capital into B&T's account by liquidating some of Sterling-Walker's investments. Sterling-Walker is an investment fund held by Mr. Walker and his wife. Those funds were deposited into B&T's account by National Financial Services, LLC.

One area of dishonesty was the failure to disclose that B&T had been dealing with issues from one of its biggest federal clients since 2019. Those issues came to a head in 2022 and required the payment of substantial fines. As a result, the Firm asked Mr. Andoh to exit the partnership.

These multiple issues resulted in B&T's inability to cover its normal operating expenses in 2024 and 2025. B&T's operating account was withdrawn frequently.

As a result, Mr. Walker infused capital into the Firm through loans from Sterling-Walker. In total, Sterling-Walker loaned the Firm—through deposits directly into B&T's operating account— a total of over $700,000 to date, as summarized below:

| Payments made by SWE to B&T | |
|---|---|
| **Date** | **Amount** |
| 5/11/2022 | $150,000 |
| 2/13/2024 | $100,000 |
| 3/20/2024 | $50,000 |
| 4/5/2024 | $50,000 |
| 5/8/2024 | $25,000 |
| 5/28/2024 | $25,000 |
| 6/25/2024 | $25,000 |
| 7/26/2024 | $25,000 |
| 9/30/2024 | $40,000 |
| 10/23/2024 | $50,000 |
| 11/5/2024 | $40,000 |
| 11/21/2024 | $14,577.17 |
| 6/4/2026 | $125,000 |
| 7/22/2026 | $25,000 |
| **TOTAL** | $744,577 |

Compounding these issues, in January 2025, B&T failed its 2022 peer review, based on issues cited with Mr. Andoh's work. Mr. Moret then retired in February 2025.

**C. <u>The Plan is Discontinued for Lack of Use.</u>**

In August of 2025, Mr. Walker evaluated B&T's continued use of its Plan. At that time, few employees were utilizing the plan. As such, Mr. Walker began working with Bernard Robertson ("**Mr. Robertson**") of the Hackett Group to terminate the Plan with John Hancock.

On August 29, 2025, Mr. Robertson instructed Mr. Walker that to terminate the Plan with John Hancock, John Hancock needed: 1) a termination date, and 2) a reason for plan termination. *See* August 29, 2025, email attached as Exhibit "C". No other requirements were outlined or discussed.

After a video conference meeting, John Hancock representatives emailed Mr. Walker on October 8, 2025, with several documents to be filled out to begin the process. *See* October 8, 2025, correspondence, attached as Exhibit "D". Mr. Walker then forwards that communication to Mr. Robertson to ask him how those tasks will get accomplished. Mr. Robertson responded: "I'll review the documents and coordinate with the B&T team to ensure we work with the 5 participants to rollover their assets buy deadlines outlined." Ex. D.

On October 9, 2025, John Hancock sent Mr. Walker and Mr. Roberston a form letter requesting termination, suggesting a discontinuance date of November 20, 2025, and asking that it be filled out and signed. On October 14, 2025, John Hanock reached out to request the filled out and signed form be returned. At that point, Mr. Walker requested a meeting with Mr. Robertson to discuss the issuance of the notices to the plan's inactive participants. *See* October 2025 Correspondence, attached as Exhibit "E". Active plan participants could make their own elections online. Despite being the investment consultant, Mr. Robertson could not find time to meet with Mr. Walker in October despite his multiple requests.

On October 30, 2025, Mr. Walker filled out, signed, and emailed in the Request for Contract Termination to John Hancock as requested. *See* October 30, 2025, correspondence, attached as Exhibit "F". Importantly, the form clearly noted that Mr. Walker was selecting for individual Plan participants to receive their owed funds directly, rather than those funds being routed through the Trustee.

If you have elected the individual participant payout option, please select one of the following:

☒ I elect to have both the confirmation and check (if issued as the method of payment) for any individual participant payout withdrawal mailed directly to the payee.

☐ I elect to have both the confirmation and check (if issued as the method of payment) for any individual participant payout withdrawal mailed directly to the trustee.

The form then states that all remaining assets would be electronically deposited with the Trustee.

On October 30, 2025, Mr. Walker again followed up with Mr. Robertson asking if Mr. Robertson had reached out to plan participants as they would need help getting new accounts set up for the deposits. Mr. Robertson responded that he doesn't just reach out to participants until notice of terminations are sent. Mr. Walker responded back that same day and affirmatively stated that this was Mr. Robertson's responsibility, which is why he was included in the discussions and meetings (where he would not otherwise have a role).

On November 7, 2025, Mr. Robertson sent notices to the five remaining participants in the plan, including the three Plaintiffs, Mr. Moret, Ms. Jones, and Mr. Hunter, copies of which are attached as Exhibits "G", "H", and "I". At this point, Mr. Robertson was to work with plan participants for their funds to be directed to a new account at the participants choosing. Importantly, the letters clearly stated that the plan was being discontinued as of November 17, 2025. Thus, it is clear that Mr. Walker's actions were not an attempt to secret away money.

From November 3-17, B&T's Operating Account with Hancock Whitney was overdrawn, a state that had become common after the 2022 Partners' actions.

On November 21, 2025, as set by John Hancock, funds from the discontinuance of the Plan were electronically transferred into B&T's operating account. The funds totaled $1,703,376.26. Mr. Walker, grateful for the large balance of residual funds provided to the Trustee, used the funds to address B&T's mounting debt. By this time, Sterling-Walker had loaned B&T $594,577. Those funds were repaid. In addition, B&T had about $350,000 in loans with Hancock Whitney and about $125,000 in credit card debt; those items were also paid off. About $110,000 was used for back

taxes. The remaining funds went to SBA loans, back rent payments, and other business expenses. These transactions occurred in November and December 2025.

**D. <u>The Allegations in the Lawsuit.</u>**

Plaintiffs allege that in November 2025, Walker, acting in his capacity as plan administrator of the Plan and without Plaintiffs' knowledge, authorization, or consent, unlawfully liquated the Plan by directing its assets be transferred to B&T's Hancock Whitney operating account (the "**B&T Operating Account**").[2]

It is alleged that following the transfer, Walker dispersed the funds from the B&T Operating Account into several other accounts, namely, a personal brokerage and investment account Walker held with National Financial Services, LLC (the "**NFS Account**"), a checking account Waker holds with Capital One, N.A. (the "**Capital One Account**"), and a checking account in Walker's name at Hancock Whitney (the "**Hancock Whitney Account**").[3] Walker is alleged to have disbursed $500,000 on November 25 and November 26, 2025 to the NFS Account with a designation for the credit of Sterling-Walker Enterprises, LLC ("**Sterling Walker**"), an entity Plaintiffs allege is controlled by Walker and his wife.[4] Following the disbursement, on December 2 and December 3, 2025, Walker is alleged to have deposited $100,000 by check to his Capital One Account.[5] Walker is also alleged to have deposited $50,000 by check to his Hancock Whitney Account on December 3, 2025.[6] In total, Walker is alleged to have wrongfully transferred $1,250,000 to his accounts.

[2] Rec. Doc. 1, Complaint, pp. 5-6, at ¶¶ 15-18.
[3] Rec. Doc. 1, Complaint, pp. 7-8, at ¶ 20(a)-(e).
[4] Rec. Doc. 1, Complaint, p. 7, at ¶ 20(a)-(b).
[5] Rec. Doc. 1, Complaint, p.7, at ¶ 20(c)-(d).
[6] Rec. Doc. 1, Complaint, p. 8, at ¶ 20(e).

It is alleged that Plaintiffs discovered the liquidation of the Plan in January 2026.[7] Formal notices of claims and litigation holds were sent to B&T and John Hancock—the institution that held the Plan's funds—in May 2026.[8] This suit was instituted on July 24, 2026, over six months after the discovery of the Plan's liquidation.

## II. LAW AND ARGUMENT

A plaintiff must establish four elements to secure a preliminary injunction: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest. *E.g., Janvey v. Alguire,* 647 F.3d 585, 595 (5th Cir.2011)*; Women's Med. Center of Nw. Houston v. Bell,* 248 F.3d 411, 419, n. 15 (5th Cir.2001). Plaintiffs have not and cannot establish these four factors.

### A. Irreparable Injury will not Result if an Injunction is not Issued and a Preservation of the Status Quo doesn't address Plaintiffs' Claims.

"Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (3d ed. 2013). Irreparable harm means "harm for which there is no adequate remedy at law," such as monetary damages. *Miranda on behalf of M.M. v. Alexander*, 2021 WL 4352328, at *4 (M.D. La. Sept. 24, 2021) (citing *Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 585 (5th Cir. 2013)).

[7] Rec. Doc. 1, Complaint, p. 8, at ¶ 22.
[8] Rec. Doc. 1, Complaint, p. 9, at ¶ 25.

**1. Plaintiffs claims are not irreparable, but are compensable with monetary damages.**

Irreparable injury is harm that "cannot be undone through monetary damages" — that is, harm for which money damages are inadequate or for which money damages are "especially difficult" to compute. *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981); *Allied Marketing Group, Inc. v. CDL Marketing, Inc.*, 878 F.2d 806, 810 n.1 (5th Cir. 1989).

As jurisprudence within the Fifth Circuit have held, a temporary restraining order and preliminary injunction cannot be issued if there is no irreparable injury, meaning that there can be no opportunity for relief through monetary damages. *Innovative Manpower Sols., LLC v. Ironman Staffing, LLC*, 929 F. Supp. 2d 597, 619 (W.D. La. 2013) ("In short, '[t]he key word ... is irreparable,' and an 'injury is irreparable only if it cannot be undone through monetary remedies.'") (citing *Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir.1975). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Id.*

The Fifth Circuit has defined irreparable harm to mean "harm for which there is no adequate remedy at law," such as monetary damages. *Monumental Task Committee v. Foxx,* 157 F. Supp. 3d 573, 583 (E.D. La. 2016) (citing *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir.2013)). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against the claim of irreparable harm." *Martono-Chai*, 2025 WL 974251 at *1 (citing *Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir. 1975) (citation omitted)).

Importantly, "**injunctions will not be granted merely to allay fears and apprehensions, or to soothe anxieties**." *Monumental Task Comm.,* 157 F. Supp. 3d at 584 (**emphasis** added). Instead, Plaintiffs must show that the "irreparable injury is *likely* in the absence of an

injunction." *Id.* at 583 (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). There must be more than "an unfounded fear," and a showing that the threatened harm is "more than mere speculation." *Id.* The U.S. Supreme Court has made clear that for extraordinary relief to be proper, the allegations must establish an imminent injury based on present day conduct. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102–03 (1983).

The adequate remedy here to address Plaintiffs' alleged injuries is monetary. Any alleged harm to Plaintiffs can be undone through monetary damages according to Plaintiffs own allegations and motions. Plaintiffs ultimately seek $1,142,421.84 for Mr. Moret, $68,427.70 for Mr. Hunter, and $17,252.94 for Ms. Jones. Assuming all Plaintiffs' allegations can be proven (which is denied), any loss due to Defendants' alleged actions are quantifiable and is resolved through money.

To be clear, Defendants are not arguing that all Plaintiffs' assertions lack merit or that some funds are not due to Defendants. Rather, an injunction—the request at issue in this opposition—at this point on accounts that don't hold the implicated funds is improper. The alleged damages are not "irreparable"; they are compensable in money.

**2. <u>Plaintiffs' delay in filing suit shows no immediate and irreparable threat.</u>**

Plaintiffs' request for an immediate TRO and preliminary injunction is gravely inconsistent with Plaintiffs' assertions of obtaining information in November 2025 showing the discontinuance of the Plan. While Plaintiffs may be owed monetary damages, those are not immediately irreparable to justify an injunction.

In *Premium Parking Serv., LLC v. Olivier*, the plaintiff sought a temporary restraining order and to set a preliminary injunction hearing against its former employee and his new business. *Premium Parking Serv., LLC v. Olivier*, 2023 WL 5275219, at *1 (E.D. La. Aug. 16, 2023). This

Court denied the motion for temporary restraining order, finding that the plaintiff failed to demonstrate that there is a substantial threat it will suffer "immediate and irreparable injury." *Id.* at 3. The court reasoned that the plaintiff failed to demonstrate the threshold requirement of an "immediate and irreparable" threat of injury, largely because of a nearly four-month delay in filing suit. *Id.* at 4. The court applied the principle that "a plaintiff's delay in seeking a temporary restraining order is held as an indication that there is no immediate threat," and that "[a]n unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm." *Id.* (citing 11A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2951 (3d ed.)); *Open Top Sightseeing USA v. Mr. Sightseeing, LLC,* 48 F. Supp. 3d 87, 90 (D.D.C. 2014) (quoting *Newdow v. Bush,* 355 F. Supp. 2d 265, 292 (D.D.C. 2005)).

Further, in *Walker v. National Collegiate Athletic Association*, the Middle District of Louisiana denied the plaintiff's motion for a preliminary injunction seeking to restore his NCAA eligibility for the 2025–2026 season. 2025 WL 1901907, at *1 (M.D. La. July 1, 2025). This Court ruled that the plaintiff failed to demonstrate irreparable harm because he waited an unjustifiably long time before filing suit, despite knowing of the eligibility issue. *Id*. at 7. The plaintiff waited more than three months after learning he had exhausted his eligibility. *Id.* The court wrote:

> The law is well-established that: [D]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction. Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief.

(citing to *W. Sur. Co. v. PASI of LA, Inc.,* 334 F.Supp.3d 764, 799 (M.D. La. 2018)). The delay of over three months by the plaintiff "militates against a finding of irreparable harm." *Id.; see also Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975) (affirming district court's

denial of temporary injunctive relief where movant delayed three months in making its request for relief).

Here, Plaintiffs received notice on November 7, 2025, of the discontinuation of the Plan. Also, Mr. Moret confirms he was certain of the closure at least as far back as January 2026. Plaintiffs then waited **seven months** to ask this Court to freeze the bank accounts at issue. The "status quo" now in place is not one that, if preserved, would assist Plaintiffs. Had B&T's account been frozen in November or December, the requested remedy could be linked to the amounts Plaintiffs request. However, the status quo of the accounts now, months after the issue arose, is not one that should be preserved in furtherance of Plaintiffs' claims.

**B. Plaintiffs are not Likely to Succeed on all Merits.**

Plaintiffs have made several allegations of ERISA violations. As outlined above, the allegations on which some of these are based are incorrect, such as Plaintiffs' assertion of a lack of notice of the discontinuation of the Plan.

Further, Mr. Walker and B&T dispute Mr. Moret's purported amount due. Mr. Moret's purported amount appears to encompass three categories of funds: ~$429,000 employee contribution, ~$304,000 Employer (firm) contributions to the plan, and ~$409,00 additional funds allocated to Moret when other partners exited the plan. Mr. Walker disputes that Mr. Moret is due the amounts attributed to the employer contributions or the re-allocated funds. Particularly, the alleged employer match funds would have been made contrary to the Firm's Partnership Agreement and in violation of individual taxing requirements. Thus, it is disputed that Mr. Moret is owed $1,142,421.84.

It is admitted that Ms. Jones and Mr. Hunter are owed their contributions. Initially, Mr. Walker believed their portion of the funds were forfeited funds. He has since realized that is an

incorrect interpretation of the Plan documents. These amounts, however, are not addressed through an injunction, but through relief for monetary sums.

**C. <u>Plaintiffs' Request for Constructive Trust and Sequestration Cannot be Granted Because the Full $1,228,102.48 is not Traceable.</u>**

Plaintiffs have requested that this Court impose a constructive trust over $1,228,102.48 in Plan trust assets that are allegedly traceable and held in certain accounts held by Defendants. Plaintiffs additionally request that the Court to issue writs of civil sequestration to secure the funds pending the outcome of this litigation. However, these requests ignore the reality that a portion of the funds have been expended and are no longer traceable.

**1. <u>Constructive trust is a purely equitable remedy that cannot extend to a defendant's general assets.</u>**

"Equitable remedies 'are, as a general rule, directed against some specific thing; they give or enforce a right to or over some particular thing … rather than a right to recover a sum of money generally out of the defendant's assets.'" *Montanile v. Bd. of Trustees of Nat. Elevator Indus. Health Benefit Plan*, 577 U.S. 136, 145 (2016) (quoting 4 S. Symons, Pomeroy's Equity Jurisprudence § 1233, p. 694 (5th ed. 1941) (Pomeroy)). A constructive trust is an equitable remedy that imposes an equitable lien on property because of a fiduciary relationship between the parties. *Schwegmann v. Schwegmann*, 441 So.2d 316, 322 (La. App. 5 Cir. 1983). An equitable lien may only be enforced against specifically identified funds in the defendant's possession or against traceable items the defendant purchased using the funds. *Montanile*, 577 U.S. at 145. Once the funds sought to be recovered have been expended on non-traceable items, the equitable lien is destroyed. *Id*. "'[W]here a person wrongfully disposed of the property of another but the property cannot be traced into any product, the other … cannot enforce a constructive trust or lien *upon any part of the wrongdoer's property*.'" *Id.* (emphasis in original) (quoting Restatement of Restitution § 215(1), p. 866 (1936) (Restatement)). In such circumstances, a personal claim against the

defendant's general assets may arise, but recovery from the assets is a legal remedy, not an equitable remedy. *Id*.

Here, Plaintiffs invoke 29 U.S.C. § 1132(a)(3) to seek equitable relief in the form of a constructive trust to be established over an alleged $1,228,102.48 in frozen assets held in four separate accounts. Plaintiffs argue that if "Walker or Sterling-Walker Enterprises are permitted to transfer or spend the monies currently sitting in the four enumerated accounts, Plaintiff's (sic) statutory right of recovery will be compromised."[9] However, Plaintiffs are not entitled to this equitable remedy because they have failed to demonstrate that the $1,228,102.48 remains in the accounts or is fully traceable. Plaintiffs cannot do so—many of the funds have been dissipated to satisfy outstanding liabilities of B&T, which Plaintiffs themselves acknowledge. *See* Rec. Doc. 1, at ¶ 20(f) ("Walker utilized Plaintiffs' retirement assets to clear corporate and personal liabilities, including EIDL Loan payments . . .corporate IRS tax payments . . . and recurring payments to Chase, American Express, and Discover.").

B&T's Operating Account demonstrates a clear erosion of the Plaintiffs' claimed funds. The B&T Operating Account received an incoming wire transfer of $1,703,376.26 on November 21, 2025.[10] Subsequently, on November 25, 2025, an outgoing wire transfer of $500,000 was attempted to be made to the NFS Account, but that transfer failed. However, on November 26, 2025, the $500,000 transfer went through. Additionally, on November 26, 2025, three payments of $15,000 were made to the Internal Revenue Service, as well as payment of $24,000 for an SBA EIDL loan. In total, $583,600 of the $1,703,376.26 was expended between November 21, 2025, and November 25, 2025 on payments to debts, the IRS, and the SBA alone. Additionally, dozens

---

[9] Rec. Doc. 7-1, Plaintiffs' Memorandum in Support of TRO, Preliminary Injunction, and Writ of Civil Sequestration, at pp. 5-6.

[10] Copies of the referenced statements will be used and provided at the hearing but are not attached hereto due to their sensitive nature.

of payments were made in connection with the operation of B&T in that time. By November 28, 2025, the B&T Operating Account's balance was $718,112.53—a $985,263.73 difference from the November 21, 2025, deposit of $1,703,376.26.

This continued in December 2025. On December 5, 2025, two payments of $9,755 and $9,858 were made for the SBA EIDL LOAN. On December 9, 2025, two payments of $10,000 and $30,000 were made to the IRS, with another payment of $10,000 on December 29. As was the case in November, a plethora of other payments were made as part of the operation of B&T. The ending balance of the B&T Operating Account in December 2025 was $191,193.

No further payments of debts or expenses were made after December 2025. However, the funds from the November 21, 2025, deposit were not exclusively limited to these payments. From November 21, 2025, onwards, funds were expended from the B&T Operating Account to pay the liabilities and expenses of B&T, such as credit card and loan payments, payroll, payments to vendors, and other business expenses. By the end of March 2026, the B&T Operating Account had a balance of $9,944. The account was overdrawn on April 7, 2026. As of July 2026, the account had a balance of $27,541.92.

The $1,703,376.26 in funds that were deposited into the B&T Operating Account have been expended. Although a portion of the funds were deposited into Mr. Walker's personal accounts, those funds are also dissipated. As of August 13, 2026, Mr. Walker' personal Hancock Whitney account—which is alleged to have received $50,000—has a balance of $1,236.13. As of June 30, 2026, Mr. Walker's personal Capital One account had a balance of $7,408.38, far less than the $200,000 he is alleged to have deposited in December 2025. Additionally, approximately $150,000 remains in the NFS Account due to subsequent transfers to the B&T Operating Account and expenses paid in connection with Sterling Walker's business activities. It is submitted that

placing those funds in constructive trust is proper, but only to the extent that they can be traced. However, because the remainder of the alleged Plan funds have been expended on nontraceable items, any claimed equitable lien has been destroyed and Plaintiffs' only remedy to recover the amount is legal, not equitable. *See Montanile*, 577 U.S. at 145-46.

Granting Plaintiffs' request and imposing a constructive trust upon the B&T Operating Account, NFS Account, Capital One Account, and Hancock Whitney Account would unduly encompass Mr. Walker and B&T's general assets and in effect convert Plaintiffs' claim for equitable relief into a claim for legal relief. As such, this Court should decline to impose a constructive trust over the full amount of $1,228,102.48.

**2. <u>The freezing and sequestration of accounts that do not contain alleged Plan funds is improper.</u>**

In addition to requesting the imposition of a constructive trust, Plaintiffs also request that $1,228,102.48 in plan assets held in the National Financial Services, Capital One, and Hancock Whitney accounts be frozen and sequestered through the issuance of a writ of sequestration.[11] Generally, a court may enter a preliminary injunction freezing a defendant's assets pending judgment where a plaintiff asserts a lien or equitable claim in the particular assets it seeks to freeze, rather than a claim that is purely for money damages. *Turnkey Offshore Project Service, LLC v. JAB Energy Solutions, LLC*, 2021 WL 3509677, at *7 (E.D. La. Aug. 10, 2021); *see Deckert v. Independence Shares Corp.*, 311 U.S. 282, 289-91 (1940) (district court has equitable power to preliminarily freeze a defendant's assets in suits sounding in equity). However, the "injunction must be drafted 'so as not to freeze assets not subject to equitable remedies.'" *Turnkey Offshore*, 2021 WL 3509677, at *7 (quoting *In re Fredeman Litigation*, 843 F.2d 821, 825 (5th Cir. 1988)).

[11] Rec. Doc. 7-1, Plaintiffs' Memorandum in Support, at pp. 8-9.

Plaintiffs have requested that the Court issue writs of civil sequestration to freeze the accounts and secure the funds during the pendency of this action.[12] The writ of sequestration is an extremely harsh remedy and may only be issued where the ownership or right to possession of property is claimed and it is alleged to be within the power of the defendant to conceal, dispose of, or waste the property or remove the property from the parish during the pendency of the action. *Fausse Riviere, L.L.C. v. Snyder*, 16-0633 (La. App. 1 Cir. 2/15/17), 211 So.3d 1188, 1197; La. C.C.P. art. 3571. A writ of sequestration may only be issued only when the nature and amount of the claim and the grounds relied upon for the issuance of the writ clearly appear from facts shown by a verified petition or separate affidavit. La. C.C.P. art. 3501. Strict adherence to the formalities of the law by the requesting party is required to maintain the writ. *Fausse Riviere*, 211 So.3d at 1197.

Here, the amount of the claim the Plaintiffs seek to conserve by writ of sequestration does not clearly appear from the facts of their Complaint. Plaintiffs seek to secure $1,228,102.48, but as explained above, Plaintiffs do not have a full ownership right in the funds that are currently in the accounts owned by Mr. Walker, Sterling Walker, and B&T. This is reinforced by the facts alleged in Plaintiffs' Complaint, which indicate that the funds have been expended.[13] Thus, because strict adherence to the law is required to maintain a writ of sequestration, the Court should refrain from issuing writs that sequester funds that Plaintiffs have no ownership of.

## **CONCLUSION**

For the foregoing reasons, Defendants, Jonald Walker, III, Bruno & Tervalon, LLP, and Sterling-Walker Enterprises, LLC pray that this Honorable Court deny Plaintiffs, Clyde M. Hunter,

[12] Rec. Doc. 7-1, Plaintiffs' Memorandum in Support, at p. 10.
[13] Rec. Doc. 1, Complaint, pp. 7-8, at ¶ 20-21.

Shikeema L. Jones, Waldo J. Moret, Jr., Motion for Temporary Restraining Order and Preliminary Injunction.

Respectfully submitted:

**BREAZEALE, SACHSE & WILSON, L.L.P.**
23rd Floor, One American Place
Post Office Box 3197
Baton Rouge, LA 70821-3197
Telephone (225) 387-4000
Telecopier (225) 381-8029

*/s/ Danielle L. Borel*
Danielle L. Borel, T.A. (La. Bar #35669)
danielle.Borel@bswllp.com
Alec B. Keane (La. Bar #41294)
alec.keane@bswllp.com

*Counsel for Defendants, Jonald Walker, III, Bruno & Tervalon, LLP, and Sterling-Walker Enterprises, LLC*